IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Goldata Computer Services, Inc. :
d/b/a Goldata Financial, Elliot :
Mitchell Goldberg, 1931 Funding, LLC, :
442 Funding, LLC, 567 Funding, LLC, :
803 Funding, LLC, and Legs 1, LLC, :
              Petitioners :
               :
        v. :
               :
Department of Banking and :
Securities, : No. 328 C.D. 2024
        Respondent : Submitted: April 8, 2025


BEFORE:   HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MATTHEW S. WOLF, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE COVEY                            FILED:  December 9, 2025


      Goldata Computer Services, Inc. d/b/a Goldata Financial (Goldata), Elliot Mitchell Goldberg (Goldberg), 1931 Funding, LLC (1931), 442 Funding, LLC (442), 567 Funding, LLC (567), 803 Funding, LLC (803), and Legs 1, LLC (LEGS) (collectively, the Goldberg Entities) petition this Court for review of the Department of Banking and Securities' (Department) February 28, 2024 final order (Final Order) adopting the Department Hearing Officer's (Hearing Officer) Proposed Report and Order, as amended, that concluded that the Goldberg Entities violated the Pennsylvania Securities Act of 1972 (Act)[1] and the Department's attendant regulations (Regulations), ordered the censure of Goldata and Goldberg, and directed the Goldberg Entities to pay $931,000.00 in administrative assessments. The Goldberg Entities present six issues for this Court's review: (1) whether the record evidence supported the Department's finding that the 1931, 442, 567, 803,

---

[1] Act of December 5, 1972, P.L. 1280, *as amended*, 70 P.S. §§ 1-101 - 1-705.

and LEGS' (collectively, LLCs) promissory notes (LLC Notes) were not exempt from registration; (2) whether the record evidence supported the Department's finding that Goldata had custody of client funds; (3) whether strict liability applied to the Department's Bureau of Securities Compliance and Examinations' (Bureau) claims brought pursuant to Section 401(b) the Act, 70 P.S. § 1-401(b), and whether omitting merchant cash advance (MCA) transaction funder identities and omitting the disclosure that Goldberg may not collect his full management fee under the terms of the LLC Notes were actionable thereunder; (4) whether the record evidence supported the Bureau's claims brought pursuant to Section 401(c) of the Act, 70 P.S. § 1-401(c), based on the Bureau's expert testimony; (5) whether the record evidence supported the allegations relative to Section 401(b) and (c) of the Act in the absence of any damage complaints; and (6) whether the Department abrogated the Goldberg Entities' constitutional rights to a jury trial and other due process rights guaranteed by both the United States (U.S.) and Pennsylvania Constitutions, including a prohibition against excessive penalties. After review, this Court affirms.

## Background[2]

Pursuant to Section 301 of the Act,[3] 70 P.S. § 1-301, Goldberg registered Goldata with the Department as a registered investment adviser (RIA)[4] in

---

[2] The background is largely taken from the parties' October 7, 2022 Joint Stipulation of the Parties. *See* Reproduced Record at 123a-139a.

Goldata's Reproduced Record fails to comply with the Pennsylvania Rules of Appellate Procedure (Rule). *See* Pa.R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures . . . thus 1, 2, 3, etc., followed in the reproduced record by a small a, thus 1a, 2a, 3a, etc."). This Court will refer to Reproduced Record page numbers followed by a small a as Rule 2173 requires.

[3] Section 301(c) of the Act declares, in relevant part: "It is unlawful for any person to transact business in this [s]tate as an investment adviser unless he is so registered . . . or unless he is exempted from registration." 70 P.S. § 1-301(c).

[4] Section 102(j) of the Act defines *investment adviser* as

2005. *See* Joint Stipulation of the Parties (Stip.) ¶ 20 (Reproduced Record (R.R.) at 131a). From approximately June 2005 to June 30, 2022, Goldberg was president and owner of Goldata. *See* Stip. ¶ 14 (R.R. at 130a). From approximately June 2005 to June 30, 2022, Goldberg was registered with the Department in accordance with Section 301 of the Act as Goldata's investment adviser representative (IAR).[5] *See* Stip. ¶ 21 (R.R. at 131a). Goldata's fiscal year ended June 30th. *See* Stip. ¶ 90 (R.R. at 137a). Goldberg formed, and was also the manager and sole member of the LLCs. *See* Stip. ¶¶ 15-19, 92 (R.R. at 130a, 138a). The Goldberg Entities had the same address - 1931 Lafayette Road, Gladwyne, Pennsylvania 19035 - but separate

----

> any person who, for compensation, engages in the business of advising others, either directly or through publications, writings[,] or electronic means, as to the value of securities or as to the advisability of investing in, purchasing[,] or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.

70 P.S. § 1-102(j).

[5] Section 102(j.1)(i) of the Act defines an *IAR*, in pertinent part, as follows:

> (i) [W]ith respect to any [RIA], any partner, officer, director[,] or person occupying a similar status or performing similar functions, or other individuals employed by or associated with an investment adviser who performs any of the following:
>
> > (A) Makes any recommendations or otherwise renders advice regarding securities;
> >
> > (B) Manages accounts or portfolios of clients;
> >
> > (C) Determines which recommendation or advice regarding securities should be given;
> >
> > (D) Provides investment advice or holds himself or herself out as providing investment advice;
> >
> > (E) Supervises employes who perform any of the foregoing; or
> >
> > (F) Receives compensation to solicit, offer[,] or negotiate for the sale of or for selling investment advice.

70 P.S. § 1-102(j.1)(i).

operating agreements and bank accounts.  *See* Stip. ¶¶ 13-19, 91 (R.R. at 130a, 137a).

From approximately November 2016 to December 2016, LEGS sold limited liability company units (LEGS Units) to individuals (LEGS Purchasers).  *See* Stip. ¶ 82 (R.R. at 137a).  The private placement memoranda (PPM)[6] which accompanied the sales declared that proceeds from the sales would be used to purchase interests in investment funds that would acquire life settlements.  *See* Stip. ¶ 83 (R.R. at 137a).  During that time, LEGS sold LEGS Units to at least 2 Pennsylvania residents (PA Residents) for an aggregate amount of $200,000.00.  *See* Stip. ¶ 84 (R.R. at 137a).  In December 2016, LEGS sold the LEGS Units to at least 1 individual who was also a Goldata client at the time of his/her purchase, for an aggregate amount of $50,000.00.  *See* Stip. ¶ 85 (R.R. at 137a).  On or about November 22, 2016, LEGS filed a Notice of Exempt Offering of Securities (Exemption Notice) with the Department pursuant to Regulation D, Rule 506(b) of the federal Securities Act of 1933 (1933 Act), 17 C.F.R. § 230.506(b) (Federal Rule 506(b)), claiming that the LEGS Units were federally covered securities.  *See* Stip. ¶ 89 (R.R. at 137a).  At least 1 LEGS Purchaser was aged 60 or more at the time he/she purchased the LEGS Units.  *See* Stip. ¶ 86 (R.R. at 137a).  As of June 14, 2021, all principal and interest (P&I) due on the LEGS Units was returned to the LEGS Purchasers.  *See* Stip. ¶ 61 (R.R. at 135a).

---

[6] Goldberg detailed:

> The purpose [of a PPM] is to comply with the law.  If you're going to sell a security, you need to disclose as much as you can of the risks involved in somebody, in my case[,] purchasing a [N]ote.  Part of the PPM includes the subscription agreement.  It includes the promissory [N]ote.  But it also includes many, many disclosures that people can read so that they can make an informed decision as to what they're getting into.

R.R. at 450a.

4

From approximately March 2017 through November 2017, Goldberg offered and sold Memoranda of Indebtedness issued by 1 Global Capital, LLC, a/k/a 1st Global Capital, LLC, a/k/a 1st Global Capital Financial Services (Global) (Global Notes), a Florida limited liability company that provided MCA transaction funding to at least 14 PA Residents for an aggregate amount of at least $646,000.00. *See* Stip. ¶¶ 22-25, 27 (R.R. at 131a). For its participation in those Global Note sales, Global's marketing agent American Alternative Investments, LLC (AAI) paid Goldberg $9,293.00. *See* Stip. ¶ 26 (R.R. at 131a). Global filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Southern District of Florida on July 27, 2018 and, to date, has been unable to fulfill its financial obligations to those who purchased Global Notes. *See* Stip. ¶¶ 28-29 (R.R. at 131a-132a). The bankruptcy trustee has returned 44% of the principal the PA Residents invested in Global. *See* Stip. ¶ 30 (R.R. at 132a). Thus, Global defaulted on payments to some or all of the PA Residents. *See* Stip. ¶¶ 28-29 (R.R. at 132a).

In March 2018, through the newly created LLCs - 1931, 442, 567, and 803 - as outside business activity (OBA) separate and apart from Goldata and its RIA business - Goldberg began participating with companies engaged in making MCAs to small businesses.[7] *See* R.R. at 106a. In order to increase the LLCs' capital

---

[7] Goldberg articulated that MCAs are an alternate form of financing to traditional banking and banking institutions, whereby funders advance money to merchants who pay it back over time. *See* R.R. at 282a. Goldberg described:

> [W]hen [the funders] get a deal . . . that they underwrite and they do the collections on, they say we have a merchant ABC, a Joe's Tire Shop. And we're going to give him $50,000.00. Would you like to participate? And here's the terms of the deal. And I'll say . . . I'll take $5,000.00 of that. And that will entitle me to 10[%] of the funds that . . . Joe's Tire [Shop], pays the funder. We'll call it ABC Capital. Okay?
>
> I work with, currently, 36 different ABC Capitals, and I do that so I can provide money to investors - excuse me - my [N]ote[ ]holders,

for business expansion in concert with MCA sector growth, the LLCs borrowed funds by offering and selling promissory notes (with a variety of fixed repayment terms and interest rates) to Note holders, *see* R.R. at 107a, the terms and conditions of which the LLCs disclosed in PPMs and associated subscription agreements (SA) provided to each Note holder. *See* Stip. ¶ 94 (R.R. at 138a). The Notes evidenced debt that the LLCs owed to Note holders, who became LLC creditors. *See* R.R. at 107a. Thus, the LLCs were *issuers* of their respective Notes within the meaning of Section 102(1) of the Act,[8] and those Notes were *securities* as defined in Section 102(t) of the Act.[9] *See* Stip. ¶¶ 41-42, 55-56, 67-68, 78-79, 87-88 (R.R. at 133a-137a).

---

> diversification. So that if one funder goes bad, you still have the fund to be able to pay off your notes. So getting back to my example, I take $5,000.00 of that $50,000.00 advance. ABC Capital, the funder, does all the collections. They do all the underwriting.

> They give a report every day. We took in $100.00 from Joe's Tire [Shop]. He says okay. You're entitled to [5%] for that because you took $5,000.00 out of $100,000.00 of the advance. So you get a pro rata portion of that money back. So they take in $100.00, and I take [5%] of it. I'll get $5.00 back. That money goes into 1931 [].

R.R. at 282a-284a.

[8] Section 102(l) of the Act defines *issuer*, in relevant part, as "any person who issues or proposes to issue any security[.]" 70 P.S. § 1-102(l).

[9] Section 102(t) of the Act defines a *security* as

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; share of beneficial interest in a business trust; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; limited partnership interest; fractional undivided interest in oil, gas or other mineral rights; put, call, straddle, option or privilege on a security, certificate of deposit of a security or group or index of securities, including any interest in the securities or based upon the value of the securities, or any put, call, straddle, option or privilege entered into on a national

From approximately March 2018 until June 14, 2021, 1931 sold notes with 1-month to 5-year terms and 6% to 20% rates of return (1931 Notes) to individuals (1931 Purchasers) for $10,000.00 per 1931 Note, the PPMs for which represented that proceeds from the sales would be used to provide funds to MCA funding firms. *See* Stip. ¶¶ 33-35, 39-40 (R.R. at 132a-133a). During that time, 1931 sold 1931 Notes memorialized in 247 PPMs to 67 individuals within the U.S. for an aggregate amount of $16,097,218.00. *See* Stip. ¶ 35 (R.R. at 132a). As of June 14, 2021, 1931 had returned $6,796,398.00 in P&I to the 1931 Purchasers. *See id*. Also during that time, 1931 sold at least 716 1931 Notes to at least 28 PA Residents for an aggregate amount of at least $7,166,000.00, and approximately 369 1931 Notes to at least 7 individuals who were clients of Goldata's stock portfolio advisory services (Goldata Clients) at the time of their purchase, for an aggregate amount of $3,699,000.00. *See* Stip. ¶¶ 36-37 (R.R. at 132a-133a). At least 1 1931 Purchaser was aged 60 or more at the time he/she purchased the 1931 Notes. *See* Stip. ¶ 38 (R.R. at 133a). On or about April 12, 2018, 1931 filed an Exemption Notice with the Department for the 1931 Notes under Regulation D, Section 506(c) of the 1933 Act, 17 C.F.R. § 230.506(c) (Federal Rule 506(c)), as federally covered securities. *See* Stip. ¶ 43 (R.R. at 133a). The 1931 Notes were not registered in the Department pursuant to Section 201 of the Act, 70 P.S. § 1-201. *See* Stip. ¶ 44 (R.R. at 133a).

---

securities exchange relating to foreign currency; membership interest in a limited liability company of any class or series, including any fractional or other interest in such interest, unless excluded by clause (v); or, in general, any interest or instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by written document.

70 P.S. § 1-102(t).

From approximately June 2018 until July 2019, 442 sold notes with 6-month to 2-year terms and 6% to 16% rates of return (442 Notes) to individuals (442 Purchasers) for $10,000.00 per 442 Note, the PPMs for which represented that 442 was formed for the purpose of providing funds to MCA funding firms that give MCAs to merchants that they identify, underwrite, and service. *See* Stip. ¶¶ 59-61, 65-66 (R.R. at 134a-135a). From June 2018 until June 2019, 442 sold 442 Notes memorialized in 36 PPMs to 27 individuals within the U.S. for an aggregate amount of $1,152,500.00. *See* Stip. ¶ 61 (R.R. at 135a). From July 2018 to June 2019, 567 sold at least 37 442 Notes to at least 8 PA Residents for an aggregate amount of at least $370,000.00, and at least 7 442 Notes to at least 5 individuals who were Goldata Clients at the time of their purchase, for an aggregate amount of $77,500.00. *See* Stip. ¶¶ 62-63 (R.R. at 135a). At least 1 442 Purchaser was aged 60 or more at the time he/she purchased the 442 Notes. *See* Stip. ¶ 64 (R.R. at 135a). On or about June 3, 2019, 442 filed an Exemption Notice with the Department for the 442 Notes under Federal Rule 506(b) as federally covered securities. *See* Stip. ¶ 69 (R.R. at 135a). The 442 Notes were not registered with the Department pursuant to Section 201 of the Act. *See* Stip. ¶ 70 (R.R. at 136a). As of June 14, 2021, 442 had returned all P&I to the 442 Purchasers. *See* Stip. ¶ 61 (R.R. at 135a).

From approximately July 2019 until July 2020, 567 sold notes with 1-month to 5-year terms and 6% to 16% rates of return (567 Notes) to individuals (567 Purchasers) for $10,000.00 per 567 Note, the PPMs for which represented that 567 was formed for the purpose of providing funds to MCA funding firms that give MCAs to merchants that they identify, underwrite, and service. *See* Stip. ¶¶ 47-49, 53-54 (R.R. at 133a-134a). During that time, 567 sold 567 Notes memorialized in 31 PPMs to 16 individuals within the U.S. for an aggregate amount of $1,329,600.00. *See* Stip. ¶ 49 (R.R. at 133a-134a). From September 2019 to July 2020, 567 sold at least 50 567 Notes to at least 7 PA Residents for an aggregate

amount of at least $500,000.00, and at least 6 567 Notes to at least 2 individuals who were Goldata Clients at the time of their purchase, for an aggregate amount of $64,000.00. *See* Stip. ¶¶ 50-51 (R.R. at 134a). At least 1 567 Purchaser was aged 60 or more at the time he/she purchased the 567 Notes. *See* Stip. ¶ 52 (R.R. at 134a). On or about August 21, 2019, 567 filed an Exemption Notice with the Department for the 567 Notes under Federal Rule 506(b) as federally covered securities. *See* Stip. ¶ 57 (R.R. at 134a). The 567 Notes were not registered with the Department pursuant to Section 201 of the Act. *See* Stip. ¶ 58 (R.R. at 134a). As of June 14, 2021, 567 returned $191,760.00 in P&I to the 567 Purchasers. *See* Stip. ¶ 49 (R.R. at 132a-133a).

From approximately July 2020 until June 14, 2021, 803 sold notes with 1-month to 5-year terms and 6% to 20% rates of return (803 Notes) to individuals (803 Purchasers) for $10,000.00 per 803 Note, the PPMs for which represented that 803 was formed for the purpose of providing funds to MCA funding firms that give MCAs to merchants that they identify, underwrite, and service. *See* Stip. ¶¶ 71-73, 76-77 (R.R. at 136a). During that time, 803 sold 803 Notes memorialized in 41 PPMs to 25 individuals within the U.S. for an aggregate amount of $1,096,875.00. *See* Stip. ¶ 73 (R.R. at 136a). In addition, 803 sold at least 3 803 Notes to at least 2 PA Residents who were Goldata Clients at the time of their purchase, for an aggregate amount of $30,000.00. *See* Stip. ¶ 74 (R.R. at 136a). At least 1 803 Purchaser was aged 60 or more at the time he/she purchased the 803 Notes. *See* Stip. ¶ 75 (R.R. at 136a). On or about August 25, 2020, 803 filed an Exemption Notice with the Department for the 803 Notes under Federal Rule 506(b) as federally covered securities. *See* Stip. ¶ 80 (R.R. at 136a). The 803 Notes were not registered with the Department pursuant to Section 201 of the Act. *See* Stip. ¶ 81 (R.R. at 137a). The parties did not stipulate whether or when 803 returned P&I to the 803 Purchasers.

The parties also stipulated:

95. Each LLC PPM contained a Disclaimer disclosing: "The Subscriber understands that [] Goldberg is a[n] [RIA] and may have advised them about investment opportunities in the past, but that this offering is made by an entity that [] Goldberg controls. Because of this, the Subscriber should not rely on the advice of [] Goldberg or any of his affiliate organizations to determine the suitability of the investment for them. Subscriber should seek out independent counsel for determining whether or not to subscribe to the offering."

96. Each LLC PPM contained a further disclosure statement: "This booklet contains documents that must be read, executed[,] and returned if you wish to invest in [name of LLC], a Pennsylvania limited liability company (the Company). You should consult with an attorney, accountant, investment advisor[,] or other advisor regarding an investment in the Company and its suitability for you."

97. Each LLC PPM contained a further disclosure statement: "Offering Memorandum Advice. You have either consulted your own investment adviser, attorney[,] or accountant about the investment and proposed purchase of a Note and its suitability to you, or chosen not to do so, despite the recommendation of that course of action by the Manager. Any special acknowledgement set forth below with respect to any statement contained in the Offering Memorandum shall not be deemed to limit the generality of this representation and warranty."

98. Each LLC [SA] contained a provision stating: "Suitability. You have evaluated the risks involved in investing in the Promissory Notes and have determined that the Promissory Notes are a suitable investment for you. Specifically, the aggregate, amount of the investments you have in, and your commitments to all similar investments that are illiquid is reasonable in relation to your net worth, both before and after the subscription for and purchase of the Promissory Notes pursuant to this [SA]."

*See* Stip. ¶¶ 95-98 (R.R. at 138a-139a).

10

On June 14, 2021, the Bureau filed an Order to Show Cause (OTSC) against the Goldberg Entities pursuant to Section 35.14 of the General Rules of Administrative Practice and Procedure (GRAPP),[10] 1 Pa. Code § 35.14, seeking administrative assessments under the Act for, *inter alia*: (1) 59 counts of violating Section 201 of the Act (which makes it unlawful for a person to offer or sell securities unless those securities are registered under the Act, exempt from registration, or federally covered securities); (2) 61 counts of violating Section 401(b) of the Act (which makes it unlawful for a person to make untrue statements of or omit material facts in connection with the offer or sale of securities); (3) 14 counts of violating Section 401(c) of the Act (which makes it unlawful for a person to engage in fraud or deceit in connection with the offer or sale of securities); and (4) 5 counts of violating Section 404 of the Act, 70 P.S. § 1-404, and Section 404.014(a)(l) of the Department's Regulations, 10 Pa. Code § 404.014(a)(l) (which make it unlawful for an RIA to have custody of client funds or securities unless the RIA notifies the Department in writing on Form ADV[11] that the RIA has such custody).[12] On September 15, 2021, the Goldberg Entities filed an answer to the OTSC. *See* R.R. at 32a-96a.

---

[10] 1 Pa. Code §§ 33.1-35.251. The Department's administrative proceedings are governed by the Administrative Agency Law, 2 Pa.C.S. §§ 501-508, 701-704, *see* Section 607(e) of the Act, 70 P.S. § 1-607(e), and the GRAPP. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 981 A.2d 975 (Pa. Cmwlth. 2009); *see also* OTSC at 2 (R.R. at 2a).

[11] Officially titled the *Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Adviser*, investment advisors use Form ADV to register with the U.S. Securities and Exchange Commission and state security authorities, to amend their registrations, to report exemptions, and to amend reports.

[12] The Bureau also alleged in the OTSC: 14 counts of violating Section 301 of the Act (which makes it unlawful for a person to act as an agent unless he is registered under the Act); 5 counts of violating Section 404 of the Act and Section 404.014(a)(5) of the Department's Regulations, 10 Pa. Code § 404.014(a)(5) (which make it unlawful for an RIA to have custody of client funds or securities unless they are reviewed annually by an independent certified public accountant (CPA)); 5 counts of violating Section 305(a)(v) of the Act, 70 P.S. § 1-305(a)(v)

On February 28, 2022, pursuant to Section 35.185 of the GRAPP, 1 Pa. Code § 35.185, the Department designated the Hearing Officer from the Pennsylvania Department of State to preside at the hearing.[13] On July 1, 2022, the

(relating to willful violations of the Act or attendant Regulations), and Section 305.011(a) and (c) of the Department's Regulations, 10 Pa. Code § 305.011(a), (c) (which requires all RIAs to exercise diligent supervision over securities that includes establishing and maintaining written procedures and a system for applying and enforcing those procedures); 1 count of violating Section 303(d), 70 P.S. § 1-303(d), and 305(a)(v) of the Act and Section 303.042(a)(3)(ii)(A)-(B) of the Department's Regulations, 10 Pa. Code § 303.042(a)(3)(ii)(A)-(B) (which require that an RIA with custody of client funds or securities to have a net worth of $35,000.00 unless he meets certain criteria); 5 counts of violating Sections 304(b), 70 P.S. § 1-304(b), and 305(a)(v) of the Act and Section 304.022(a)(l) of the Department's Regulations, 10 Pa. Code § 304.022(a)(l) (which require that an RIA with custody of client funds or securities file with the Department by the end of its fiscal year an audited balance sheet prepared in accordance with generally accepted accounting principles together with an unqualified opinion by an independent CPA); 17 counts of violating Section 305(a)(ix) of the Act, 70 P.S. § 1-305(a)(ix) (relating to dishonest or unethical practices in the securities business taking unfair advantage of a customer within the previous 10 years), and Section 305.019(a) of the Department's Regulations, 10 Pa. Code § 305.019(a) (which declare that persons registered as agents (i.e., fiduciaries) under Section 301 of the Act shall act primarily for their customers' benefit and observe high standards of commercial honor and just and equitable principals of trade in conducting their businesses); 17 counts of violating Section 305(a)(ix) of the Act and Section 305.019(c)(3)(xi) of the Department's Regulations, 10 Pa. Code § 305.019(c)(3)(xi) (which declare that the Department will consider dishonest or unethical, an RIA's failure to disclose in writing to a client a material conflict of interest that could impair unbiased and objective advice); and 17 counts of violating Section 305(a)(ix) of the Act and Section 305.019(c)(3)(xv) of the Department's Regulations, 10 Pa. Code § 305.019(c)(3)(xv) (which declare that the Department will consider dishonest or unethical, an RIA taking any action relative to a client's securities or funds over which the RIA has custody or possession when the RIA's action is subject to and does not comply with Section 404.014 of the Department's Regulations). *See* R.R. at 1a-29a.

[13] On June 6, 2022, the Bureau served an application for Subpoena to Produce Documentary Evidence (Subpoena Application) on PNC Bank and the Goldberg Entities. On June 13, 2022, the Goldberg Entities filed a response opposing the Subpoena Application and a motion to dismiss the OTSC (Dismissal Motion). The Bureau opposed the Goldberg Entities' filings. On July 1, 2022, the Department's Hearing Officer denied the Subpoena Application. On September 1, 2022, the Goldberg Entities filed a brief in support of their Dismissal Motion in which they requested that the Department impose sanctions on the Bureau and the Bureau's attorneys on grounds that the Bureau failed to adequately investigate the facts as they applied to the Act and Regulations in initiating the OTSC. That same day, the Bureau submitted a report prepared by its staff accountant Christian Yother (Yother) asserting that it will raise the LLCs' insolvency at the hearing. On September 7, 2022, the Goldberg Entities filed a Motion to Strike Yother's report and

Hearing Officer scheduled a pre-hearing conference for September 8, 2022. On September 1, 2022, the parties filed pre-hearing statements. On September 19, 2022, the Hearing Officer ordered the parties to prepare a joint stipulation of facts and agree to the admissibility of exhibits they would offer into evidence, which they did. By September 20, 2022 notice, the Department scheduled a hearing by video conference for December 12 and 13, 2022.

At the hearing, the parties provided documentary evidence and the Department's Securities Compliance Officer Nathan Houtz (Houtz), Department staff accountant Christian Yother (Yother), investor Robert Harmelin (Harmelin), and Goldberg testified. *See* R.R. at 142a-510a.

After the hearing, on July 21, 2023, the Bureau filed a Petition to Reopen the Record for the purpose of taking additional evidence regarding whether the Bureau was required to prove scienter to establish a violation of Section 401(b) of the Act. Therein, the Bureau asked the Hearing Officer to take judicial notice that, on July 19, 2023, the Pennsylvania Supreme Court held in *Mimi Investors, LLC v. Tufano*, 297 A.3d 1272 (Pa. 2023),[14] that proof of scienter is not required when alleging a violation of Section 401(b) of the Act. The Hearing Officer reopened the record to allow consideration of *Mimi Investors*.

On November 30, 2023, the Hearing Officer issued a Proposed Report in which he concluded that the record evidence established that the Goldberg Entities committed 133 violations of the Act and that they should be ordered to pay

___

testimony as improper and prejudicial as it was not part of the OTSC. The Hearing Officer heard argument thereon at the September 8, 2022 pre-hearing conference and, thereafter, denied the Motion to Strike. On September 19, 2022, the Hearing Officer denied the Goldberg Entities' Dismissal Motion.

[14] The Bureau filed an amicus brief in *Mimi Investors*.

$931,000.00 in administrative assessments.[15]  *See* R.R. at 621a-696a.  On December 29, 2023, the Goldberg Entities filed a Brief on Exceptions to the Proposed Report (Exceptions) that included a Goldberg affidavit and documents purportedly confirming that he verified that 1931 Purchasers were accredited investors.  *See* R.R. at 697a-828a.  On January 16, 2024, the Bureau filed its Brief Opposing Exceptions. *See* R.R. at 829a-886a.  After reviewing the evidence and Exceptions, on February 28, 2024, the Department issued the Final Order adopting the Proposed Report, stating: "[T]he assessment proposed . . . is supported by the evidence of record and the law."[16]  *See* Goldberg Entities' Br. Attachment (Final Order) at 2.  The Goldberg Entities appealed to this Court.[17]

---

[15] In accordance with Section 602.1(c) of the Act, added by Section 3 of the Act of May 4, 1993, P.L. 4, 70 P.S. § 1-602.1(c), the Hearing Officer specifically proposed that the Goldberg Entities be held jointly and severally liable to pay to the Commonwealth of Pennsylvania: $7,000.00 for each of the 61 violations of Section 401(b) of the Act; $7,000.00 for each of the 5 violations of Section 404 of the Act, pursuant to Section 404.014(a)(1) of the Department's Regulations; $7,000.00 for each of the 5 violations of Section 404 of the Act, pursuant to Section 404.014(a)(5) of the Department's Regulations; $7,000.00 for 1 violation of Sections 303(d) and 305(a)(v) of the Act, pursuant to Section 303.042(a)(3)(ii)(A)-(B) of the Department's Regulations; $7,000.00 for each of the 5 violations of Section 304(b) and 305(a)(v) of the Act, pursuant to Section 304.022(a)(1) of the Department's Regulations; $7,000.00 for each of the 5 violations of Section 305(a)(v) of the Act, pursuant to Section 305.011(a) and (c) of the Department's Regulations; $7,000.00 for each of the 17 violations of Section 305(a)(ix) of the Act, pursuant to Section 305.019(a) of the Department's Regulations; $7,000.00 for each of the 17 violations of Section 305(a)(ix) of the Act, pursuant to Section 305.019(c)(3)(xi) of the Department's Regulations; and $7,000.00 for each of the 17 violations of Section 305(a)(ix) of the Act, pursuant to Section 305.019(c)(3)(xv) of the Department's Regulations, for a total administrative assessment of $931,000.00.  The Hearing Officer did not include an assessment for violation of Section 201 of the Act because the Act does not provide for one.  The Hearing Officer did not include assessments for violations of both Section 401(b) and (c) of the Act because Section 602.1(c)(1)(iii) of the Act does not permit an assessment under Section 401(b) of the Act where one is imposed under Section 401(c) of the Act.  *See* 70 P.S. § 1-602.1(c)(1)(iii).

[16] The Department's Final Order contained a clarifying amendment to the Proposed Report, the details of which are not relevant to the issues the Goldberg Entities raised in this appeal.  *See* Final Order at 2.

[17] This Court's "review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, or whether the necessary findings

14

## Discussion

Initially, as the charging party, the Bureau generally had the burden of proving the OTSC allegations against the Goldberg Entities,[18] while Goldberg and Goldata had the burden to prove advisor status or any exemption, exception, or exclusion from the Act. *See* Section 612(a) of the Act, 70 P.S. § 1-612(a). Moreover, the Department was the fact-finder. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 981 A.2d 975 (Pa. Cmwlth. 2009).

"[I]t is the job of the fact[-]finder to resolve conflicts in testimony." *Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 44 (Pa. Cmwlth. 2013) (quoting *Commonwealth v. Hoffman*, 938 A.2d 1157, 1160 n.10 (Pa. Cmwlth. 2007)). In doing so, "'the fact-finder is free to believe all, part or none of the evidence presented,' even if uncontradicted[.]" *Id*. "[T]his Court may not reweigh the evidence and substitute [its] judgment for that of the fact-finder." *Id*. Because "credibility and weight of the evidence are for the [Department]," this Court "will

---

of fact are supported by substantial evidence." *Byers v. Pa. Dep't of Banking & Sec., Bureau of Sec. Compliance & Examinations*, 259 A.3d 551, 557 n.4 (Pa. Cmwlth. 2021).

By April 24, 2025 Order, this Court directed the Department to certify the entire record to this Court on or before May 7, 2025, which the Department did.

[18]  The degree of proof required to establish a case before an administrative tribunal is preponderance of the evidence. *Lansberry, Inc. v. P[a.] Pub[.] Util[.] Comm['']n, . . .* 578 A.2d 600, 602 ([Pa. Cmwlth.] 1990). A preponderance of the evidence is generally understood to mean that the evidence demonstrates a fact is more likely to be true than not to be true, or if the burden were viewed as a balance scale, the evidence in support of the Commonwealth's case must weigh slightly more than the opposing evidence. *Se-Ling Hosiery, Inc. v. Margulies, . . .* 70 A.2d 854, 856 ([Pa.] 1950). The Commonwealth therefore has the burden of proving the charges against a respondent with evidence that is substantial and legally credible, not by mere "suspicion" or by only a "scintilla" of evidence. *Lansberry*, 578 A.2d at 602.

*Sherman Hostetter Grp. LLC v. State Bd. of Auctioneer Exam'rs*, 336 A.3d 286, 292 (Pa. Cmwlth. 2025); *see also* Final Order at 40.

15

not disturb those determinations absent an abuse of discretion." *Alsyrawan v. Dep't of Hum. Servs.*, 316 A.3d 1076, 1087 n.17 (Pa. Cmwlth. 2024), *appeal allowed in part*, 329 A.3d 448 (Pa. 2024) (quoting *Allegheny Cnty. Off. of Child., Youth & Families v. Dep't of Hum. Servs.*, 202 A.3d 155, 164 (Pa. Cmwlth. 2019)); *see also Pa. Bankers Ass'n*. "An abuse of discretion occurs where the findings of fact are not supported by substantial evidence"[19] in the record. *Pa. Bankers Ass'n*, 981 A.2d at 985.

## 1. LLC Note Registration

The Goldberg Entities first argue that the record evidence did not support the Department's finding that the LLC Notes were not exempt from registration when the stipulated facts supported their compliance in securing the federally covered security exemptions.

The Bureau alleged in the OTSC that Goldberg violated Section 201 of the Act by offering and selling purportedly exempt LLC Notes to Pennsylvania residents that were not, in fact, exempt from registration. Section 201 of the Act specifies: "**It is unlawful for any person to offer or sell any security in this [s]tate unless the security is registered under this [A]ct**, . . . **or the security is a federally covered security**."[20] 70 P.S. § 1-201 (emphasis added).

Here, the Department's findings that the LLCs were *issuers* of the LLC Notes within the meaning of Section 102(1) of the Act, that the LLC Notes were *securities* as defined in Section 102(t) of the Act, and that the LLC Notes were not

---

[19] Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion that requires something more than a scintilla creating a mere suspicion of the existence of the fact to be established." *Pa. Sav. Ass'n v. Dep't of Banking*, 523 A.2d 837, 839 (Pa. Cmwlth. 1987).

[20] Section 211 of the Act, added by Section 11 of the Act of November 24, 1998, P.L. 829, applies to federally covered securities; *see also* Section 18(b)(2) of the Securities Act of 1933, 15 U.S.C. § 77r(b)(2).

16

registered pursuant to Section 201 of the Act, are supported by the parties' Stipulations. *See* Findings of Fact (FOF) 34-35, 37, 48-49, 51, 60-61, 63, 71-72, 74, 80-81; Stip. ¶¶ 41-42, 44, 55-56, 58, 67-68, 70, 78-79, 81, 87-88 (R.R. at 133a-137a). The Department also found based on the parties' Stipulations that the LLCs filed Exemption Notices with the Department, therein asserting that the 442, 567, and 803 Notes were exempt from registration as federally covered securities under Federal Rule 506(b), and the 1931 Notes were exempt from registration as federally covered securities under Federal Rule 506(c). *See* FOFs 36, 50, 62, 73, 82; Stip. ¶¶ 43, 57, 69, 80, 89 (R.R. at 133a-137a).

<u>Federal Rule 506(b) Exemption</u>

In order for the Federal Rule 506(b) exemption to apply to 442, 567, and 803, those LLCs had to meet the conditions listed therein. Federal Rule 506(b)(1), applicable to the 442, 567, and 803 Notes, provides, in relevant part, that "[t]o qualify for an exemption . . . , offers and sales must satisfy all the terms and conditions of [Federal Rules 501 and 502, 17 C.F.R.] §§ 230.501 [(relating to general conditions to be met)], 230.502 [(relating to definitions)]." 17 C.F.R. § 230.506(b)(1) (relating to general conditions to be met in offerings).

Specifically, Federal Rule 502(c)(1) prohibits an issuer from "offer[ing] or sell[ing]" the securities by any form of general solicitation or general advertising, including, but not limited to "[a]ny advertisement, article, notice[,] or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio[.]" 17 C.F.R. § 230.502(c)(1). *Advertisement* is defined in Section 102(a) of the Act as "any communication used in connection with a sale . . . or an offer to sell . . . a security which is publicly disseminated by means of print, radio, television, [i]nternet[,] or other media." 70 P.S. § 1-102(a). The

Goldberg Entities had "the burden of proving the availability of the . . . exemption[.]" 70 P.S. § 1-612(a).

Houtz testified that, on September 13, 2019, Goldberg's LinkedIn page represented that Goldberg was the fund manager for 442, 567, 803, and 1931, which provided funding to grow small businesses. *See* R.R. at 200a; *see also* Bureau Ex. 81. Attached to Goldberg's LinkedIn page, Houtz identified an article Goldberg authored, entitled *Shark Tank Alternative Merchant Cash Advances*, that mentioned 1931. *See* R.R. at 200a-201a. On August 31, 2022, the Bureau captured a link to Goldberg's YouTube channel that listed approximately 10 videos discussing MCAs and investment opportunities with titles like, *An Alternative Investment Opportunity in Merchant Cash Advances*, *Alternative Investment Opportunity*, *Investment Opportunity in Merchant Cash Advances*, the majority if not all of which described 1931 as an investment opportunity. *See* R.R. at 202a-205a; *see also* Bureau Exs. 100-101.

Goldberg acknowledged that he was permitted to advertise the 1931 Notes because they were only for accredited investors, but he was not permitted to advertise the 442, 567, or 803 Notes. *See* R.R. at 256a-258a. Goldberg claimed that he "strictly held to that system as much as [he] could." R.R. at 258a. Although he primarily directly marketed the LLCs to his contacts (some of whom were RIA clients), *see* R.R. at 255a, his LinkedIn page and his YouTube channel, which were part of his marketing, were also active during that time. *See* R.R. at 258a-260a. Goldberg also stated that he had met with Quest Education,[21] informed it of the LLC opportunities available for Quest Education to make referrals, and acknowledged the possibility that a number of the LLC investors heard about the investments through Quest Education. *See* R.R. at 259a-260a. In addition, in his answer to the OTSC,

---

[21] Goldberg explained that Quest Education "provided alternative investments for people with self-directed [individual retirement accounts]." R.R. at 259a.

18

Goldberg admitted that his LinkedIn page reflected that he was the fund manager for 1931, 442, 567, and 803, and that those funds "offer attractive returns of 6% to 20% annually to investors by participating in cash advances to small businesses," and further "provide[d] a link for a potential investor to view a 'video at www.1931Funding.com for details.'" R.R. at 37a-38a.

Goldberg did not dispute Houtz's observations of the *Shark Tank Alternative Merchant Cash Advances* article on Goldberg's LinkedIn page, and the approximately 10 videos on his YouTube channel that discussed the MCA investment opportunities. *See* R.R. at 200a-201a. Although the LinkedIn website and videos referenced 1931, Goldberg admitted that his LinkedIn page also represented that he was the fund manager for 442, 567, and 803, and that those funds "offer attractive returns of 6% to 20% annually to investors by participating in cash advances to small businesses[.]" R.R. at 37a-38a. Despite that he testified that he primarily directly marketed the LLC Notes to his contacts because he was not otherwise permitted to advertise them, Goldberg acquiesced that he may have received investor referrals from his online marketing and Quest Education. *See* R.R. at 256a-260a.

The Department made specific findings of fact based on that evidence, *see* FOFs 148-155, and took judicial notice of a representation on the U.S. Securities and Exchange Commission's website that "[a] solicitation that conditions the market for an offering of securities is generally viewed as a general solicitation that is marketing the securities."[22] *See* Final Order at 47-48. The Department concluded that "Goldberg engaged in general solicitation of the 442 Notes, the 567 Notes, and the 803 Notes through: (1) [] Goldberg's LinkedIn webpage[;] (2) [] Goldberg's YouTube channel[;] and (3) referrals from Quest Education" and, thus, the Goldberg

---

[22] www.sec.gov/education/capitalraising/building-blocks/general-solicitation (last visited Dec. 8, 2025).

Entities could not rely upon Federal Rule 506(b) to exempt the 442, 567, and 803 Notes from registration under Section 201 of the Act. Whether any investors *purchased* 442, 567, or 803 Notes based on Goldberg's general solicitation is of no moment when, by their express statutory terms, the *offer* alone was sufficient to nullify Federal Rule 506(b)'s protection from Section 201 of the Act.

When reviewing the Department's factual findings, this Court's role "is merely to ensure that the findings are supported by substantial evidence[.]" *Pa. Sav. Ass'n v. Dep't of Banking*, 523 A.2d 837, 839 (Pa. Cmwlth. 1987); *see also Pa. Bankers Ass'n*. Importantly, "[t]he presence of conflicting evidence in the record does not mean that substantial evidence is lacking." *Fisler*, 78 A.3d at 44 (quoting *Allied Mech. & Elec., Inc. v. Pa. Prevailing Wage Appeals Bd.*, 923 A.2d 1220, 1228 (Pa. Cmwlth. 2007)). Moreover, "[i]n determining whether a finding of fact is supported by substantial evidence, th[is] Court is required to give the party in whose favor the decision was rendered the benefit of all reasonable and logical inferences that may be drawn from the evidence of record." *Hauck v. Unemployment Comp. Bd. of Rev.*, 271 A.3d 961, 970 (Pa. Cmwlth. 2022) (quoting *Allegheny Cnty. Off. of Child., Youth & Families*, 202 A.3d at 164 (quotation marks omitted)). Giving the Bureau the benefit of all reasonable and logical inferences to be drawn from the evidence as this Court must, *see Hauck*, because the Department's FOFs relative to Goldberg's general solicitation were based on substantial record evidence, this Court will not disturb them. *See Alsyrawan*.

Federal Rule 506(c) Exemption

For the Federal Rule 506(c) exemption to apply here, 1931 had to meet the conditions listed in that provision. Federal Rule 506(c)(1) requires that, to qualify for an exemption thereunder, the offers and sales of securities must satisfy

20

Federal Rule 501.[23]  Federal Rule 506(c)(2)(i) mandates that "[a]ll purchasers of securities sold in any offering under paragraph (c) . . . are accredited investors."  17 C.F.R. § 230.506(c)(2)(i).  Federal Rule 501(a) defines *accredited investor*, in pertinent part, as

> any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:
>
> . . . .
>
> (5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000[.00]; [or]
>
> . . . .
>
> (6) Any natural person who had an individual income in excess of $200,000[.00] in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000[.00] in each of those years and has a reasonable expectation of reaching the same income level in the current year[.]

17 C.F.R. § 230.501(a).  Federal Rule 506(c)(2)(ii) commands that "[t]he issuer shall take reasonable steps to verify that purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors."  17 C.F.R. § 230.506(c)(2)(ii).  Federal Rule 506(c)(2)(ii) adds that the issuer shall be deemed to have taken reasonable steps to verify accredited investor status if he undertook one of the non-exclusive and non-mandatory methods listed thereafter, including reviewing Internal Revenue Service forms reporting the purchaser's income for the two most recent years, obtaining written confirmation of the purchaser's accredited investor status

---

[23] Rule 506(c)(1) of Regulation D also requires compliance with Rule 502(a) of Regulation D, 17 C.F.R. § 230.502(a) (relating to integration) and (d) (relating to resale conditions), *see* 17 C.F.R. § 230.506(c)(1), which do not apply here.

from a licensed attorney or CPA, or having previously assessed a purchaser's status in these ways if there is no reason to believe the status has changed. *See id.*

The Bureau alleged that the Goldberg Entities failed to demonstrate that reasonable steps were taken to verify each purchaser's accredited investor status. The Goldberg Entities had "the burden of proving the availability of the . . . exemption[.]" 70 P.S. § 1-612(a). Houtz represented that in the December 26, 2019 response to the Bureau's request for information regarding accredited investors, the Goldberg Entities merely affirmed that the 1931 Note investors were accredited investors, and that the PPMs for the 442 and 567 Notes included confidential investment questionnaires that were more detailed than the ones provided for the 1931 Note investors. *See* R.R. at 198a-199a; *see also* Bureau Ex. 15.

Goldberg similarly testified that he requested, checked, and documented proof of investor accreditation relative to the 1931 Note sales. *See* R.R. at 257a. When asked what proof he relied upon, Goldberg expounded:

> [I]f they qualified for $1 million of net worth besides their primary residence, I asked them to fill out and admit [an] investor accredited letter that stipulated that and provided proof of that and a cover of a bank statement. If they qualified by income, which was $200,000.00 personally or $300,000.00 joint, I asked for [2] years' worth of tax returns plus a sign[-]off that they expect to have that sort of income in the current year. And some of them were able to qualify by getting their attorney or accountant to sign off[; . . . t]he ones that didn't want to disclose any of their net worth.

R.R. at 257a-258a. Goldberg claimed that he had documentary proof of his accredited investor verification process, but he did not produce it, purportedly because the Bureau did not specifically request it.[24] *See* R.R. at 257a-258a.

---

[24] Goldberg produced an affidavit and verifying documentation for the first time with his Exceptions. *See* Goldberg Entities' Br. at 24; *see also* Exceptions (R.R. at 753a-828a). Although

22

Harmelin confirmed that he was an accredited investor when he purchased 1931 Notes. *See* R.R. at 239a; *see also* Stip. ¶¶ 31, 45 (R.R. at 132a-133a).

The Department acknowledged Goldberg's testimony that he verified investor status, *see* FOF 158, but because he failed to produce any documentation to that effect, *see id.*, it concluded that "Goldberg's self-serving statements without more [we]re not credible."[25] Final Order at 48. As fact-finder and ultimate judge of credibility, the Department held that the Goldberg Entities failed to take reasonable steps to verify the accredited investor status of the 1931 Note investors and, thus,

Section 35.212 of the GRAPP authorizes the inclusion of proposed findings and conclusions in exceptions, *see* 1 Pa. Code § 35.212(a)(2), they must be based on the record created before the agency. *See* 1 Pa. Code § 35.212(a)(1)(iv) (argument must cite to appropriate record references). The GRAPP does not expressly allow the Goldberg Entities to introduce evidence that existed but failed to produce at the hearing. Moreover, despite that Section 35.231(a) of the GRAPP allows a party to petition an agency to reopen the record after a hearing has concluded, reopening is generally permitted when a material change in the facts or law occurs, *see* 1 Pa. Code § 35.231(a), which was not the case here. In addition, "[r]eview of a decision reopening the record is for abuse of discretion. An exercise of that discretion will not be reversed unless clear abuse is shown." *Pocono Mountain Charter Sch., Inc. v. Pocono Mountain Sch. Dist.*, 88 A.3d 275, 291 (Pa. Cmwlth. 2014). Where, as here, the law placed the burden on the Goldberg Entities to prove that the securities were exempt from registration, and Goldberg admitted he had such proof at the time of the hearing, the Department did not abuse its discretion by refusing to reopen the record to later consider that evidence. Accordingly, this Court will not consider those documents.

Although the Goldberg Entities take issue with the Department's refusal to reopen the record for them to produce additional factual evidence when it allowed consideration of the *Mimi Investors* ruling, *see* Goldberg Entities' Br. at 27 n.9, their request was vastly different than the Bureau's request. The Department was bound by the *Mimi Investors* precedential scienter ruling and, as such, should have considered it regardless of whether either party requested it to do so. In fact, the Department could and did take judicial notice of *Mimi Investors*. *See* Final Report at 50-51.

[25] The Department also found that "Goldberg relied upon either affirmations from investors as to their accredited investor status or investor questionnaires that were included in the [] LLC PPMs[,]" FOF 156, which appears to contradict FOF 157, and thereafter concluded that "the only credible evidence that [] Goldberg checked the accredited investor status of the 1931 [Note] purchasers was to take their word for it and nothing more[, which] can hardly be considered taking reasonable steps to verify the accredited investor status of each 1931 [i]nvestor." Final Order at 48-49. Although this Court could not locate where in the record Goldberg testified that he relied solely on investor affirmations to verify their accredited status, in light of the Department's credibility determination, this was nominal error.

23

they could not rely upon the registration exemption under Federal Rule 506(c) for the 1931 Notes. *See* Final Order at 49. Giving the Bureau the benefit of all reasonable and logical inferences to be drawn from the evidence, as this Court must, *see Hauck*, because the Department's FOFs relative to accredited investor status were based on substantial record evidence, this Court will not disturb them. *See Alsyrawan*.

Because the record evidence supports that the Goldberg Entities offered or sold the 442, 567, and 803 Notes by general solicitation and did not verify the accredited status of 1931 Note investors, they failed to satisfy the conditions of Federal Rule 506(b) and (c) related to federally covered securities. Accordingly, the Department properly determined that the Goldberg Entities violated Section 201 of the Act by not registering the 442, 567, 803, and 1931 Notes with the Department.

## 2. Custody of Client Funds

The Goldberg Entities next contend that the record evidence did not support the Department's finding that Goldata had custody of RIA client funds in violation of Section 404 of the Act pursuant to Section 404.014(a)(1) of the Department's Regulations.[26] They specifically assert that Goldata Clients, acting

---

[26] Although the Goldberg Entities also declare in their summary of argument that the Department's charges for violations of Sections 303, 304, and 305 of the Act and Section 404 of the Act by virtue of Section 404.014(a)(5) of the Department's Regulations should be reversed, *see* Goldberg Entities' Br. at 10, the Statement of Questions Involved and Argument portions of their brief focus solely on Section 404 of the Act pursuant to Section 404.014(a)(1) of the Department's Regulations.

> Pursuant to [Rule] 2119(a), the argument section of an appellate brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part - in distinctive type or in type distinctively displayed - the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "At the appellate level,

independently, purchased the LLC Notes in an OBA that Goldberg conducted in a properly and fully disclosed non-IAR capacity. They further claim that since the LLCs operated free of RIA requirements and they were not pooled investments, the Department's charges for violating Section 404 of the Act pursuant to Section 404.014(a)(1) of the Department's Regulations should be reversed.

> The Bureau charged in the OTSC:
>
> Goldata, in connection with its advisory services, directly or indirectly held client funds or securities, through [] 1931, [] 567, [] 442, [] 803 and [] LEGS, with the authority to obtain possession of them or the ability to appropriate them and thus had "custody" over client funds or securities as defined in [Section] 102.021 [of the Department's Regulations].

OTSC ¶ 104 (R.R. at 17a-18a).

Initially, the Act is remedial legislation, the primary purpose of which is "to protect the investing public." *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 436 (Pa. Super. 2014) (quoting *Commonwealth v. Yaste*, 70 A.2d 685, 687 (Pa. Super. 1950)). To that end, Section 404 of the Act makes it unlawful for a person advising others as to the value or purchase of securities to engage in fraudulent, deceptive, or manipulative acts. *See* 70 P.S. § 1-404. Under Section 404.14(a) of the Department's Regulations, "[i]t is unlawful . . . for an [RIA] to have *custody* of client funds or securities" unless the RIA notifies the Department promptly in writing on Form ADV that he has or may have custody. 10 Pa. Code § 404.014(a)(1) (emphasis

---

a party's failure to include analysis and relevant authority results in waiver." *Browne v. Dep*[*'t*] *of Transp*[.], 843 A.2d 429, 435 (Pa. Cmwlth. 2004).

*770 Ameribeer, Inc. v. Pa. Liquor Control Bd.*, 318 A.3d 998, 1009 (Pa. Cmwlth. 2024). Because the Goldberg Entities failed to more specifically challenge the Department's conclusion that they violated Sections 303, 304, and 305 of the Act in its Statement of Questions Involved and failed to develop any argument in support thereof, those challenges are waived, and this Court will not separately address them.

added).  Section 102.201(a) of the Department's Regulations specifies that an RIA has *custody*

> (ii) if a related person[27] holds directly or indirectly, client funds or securities, or has authority to obtain possession of them, in connection with advisory services the [RIA] provides to clients.
>
> (iii) . . . [custody] includes:
>
> . . . .
>
> (C) Any capacity (such as general partner of a limited partnership, managing member of a limited liability company or a comparable position or another type of pooled investment vehicle, or trustee of a trust) that gives the investment adviser or its supervised person legal ownership of or access to client funds or securities.

10 Pa. Code § 102.021(a) (definitions).  Section 102.021(a) of the Department's Regulations defines *client*, in this context, as "[a] person to whom an [RIA] or [IAR] has provided investment advice for which the [RIA] or [IAR] received compensation."  10 Pa. Code § 102.021(a).

The Goldberg Entities admitted that Goldberg is an affiliate and related person of Goldata.  *See* Ans. to OTSC ¶¶ 13, 104 (R.R. at 33a-34a, 73a).  Thus, if Goldberg ever held funds or securities of Goldata's clients, then Goldata had custody thereof.  Goldberg testified that he was "the 100[%] owner and manager of all the LLCs" and had complete control of the LLCs and their bank accounts.  R.R. at 434a-437a.  The parties stipulated, and the Department found as fact, that Goldberg offered the LLCs' Notes for sale to some Goldata clients, and that some Goldata clients purchased Notes.  *See* FOFs 30, 44, 56, 67, 78.  The investing clients became

---

[27] A *related person* is "a person that is an affiliate of an investment advisor."  10 Pa. Code § 102.021.  An *affiliate* is "a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the person specified."  Section 102 of the Act, 70 P.S. § 1-102(b).

creditors of the LLCs under the Notes and the proceeds from those Note sales became the property of the LLCs, to be used to fund MCA transactions per the PPMs. *See* R.R. at 107a. Harmelin testified that when he purchased an LLC Note at Goldberg's suggestion while he was a Goldata client, he sent the purchase money by wire or check to the LLC. *See* R.R. at 236a-237a. Another Goldata client directly transferred funds from their Goldata account to purchase an LLC Note. *See* FOF 147. This record evidence supports the Department's findings that Goldata clients "transferred funds directly to [the LLCs]," over which Goldberg, not a custodian,[28] had "complete control . . . including total control and possession of [the LLCs'] bank accounts." Final Order at 59.

This Court rejects the Goldberg Entities' argument that the Department disregarded relevant evidence that the LLCs were separate and distinct from Goldata. The Department considered that evidence, including the disclaimer language in the LLCs' offerings, and correctly concluded that it does not alter the analysis of custody under the Regulation. *See* Final Order at 61. Simply, the purchase money of the Notes came into the LLCs, which Goldberg controlled, which amounts to Goldata having *custody* of client funds under the Department's Regulations. Goldata did not notify the Department of that custody as required. Accordingly, this Court will not disturb the Department's conclusion that Goldata violated the custody requirement of the Department's Regulations.

**3. Section 401(b) of the Act**

The Goldberg Entities argue that the Department erred by applying strict liability to evaluate the Bureau's charges under Section 401(b) of the Act and,

---

[28] The Department found, and the record shows, that TD Ameritrade is a custodian of *Goldata* client funds, not of the LLCs and their funds. *See* FOF 114. TD Ameritrade is not relevant to whether Goldberg had custody of client funds via his control of the LLCs.

based on *Mimi Investors*, the Department should have applied a negligence standard. They further contend that the Department erred by applying an overly broad subjective standard to conclude that they violated Section 401(b) of the Act by failing to identify the MCA funders engaged by the LLCs and failing to disclose the consequences of Goldberg collecting his full management fee from each LLC.

The Bureau charged the Goldberg Entities with violating Section 401(b) of the Act related to Goldberg's failure to disclose the MCA funding firms in which the LLCs invested and that Goldberg may not collect his full management fee from each LLC. Section 401(b) of the Act makes it unlawful for any person, in connection with the offer, sale, or purchase of any security in this state, directly or indirectly "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]" 70 P.S. § 1-401(b). The Department took judicial notice that, after the parties filed their post-hearing briefs, the Pennsylvania Supreme Court issued *Mimi Investors*, wherein it held for the first time that proof of scienter is not required for a violation of Section 401(b) of the Act. *See* Final Order at 51. Accordingly, the Department did not apply a strict liability standard when adjudicating this case.

### *Mimi Investors*

Notwithstanding, the Goldberg Entities declare that the Department is bound by its amicus argument in *Mimi Investors* that it previously followed *Aaron v. Securities & Exchange Commission*, 446 U.S. 680 (1980), in construing violations of Section 401 of the Act, and that it "should have recognized that *Aaron* requires proof of negligence[.]" Goldberg Entities' Br. at 28. However, Section 401(b) of the Act's language neither plainly references nor implies that a negligence standard applies to violations thereof, and the Pennsylvania Supreme Court's ruling that strict

liability is not an element of a violation of Section 401(b) of the Act does not mean that a negligence standard applies.

> As our analysis involves interpreting Section [401(b)] of the [] Act, we necessarily begin by considering the Statutory Construction Act [of 1972 (SCA)]. [*See*] 1 Pa.C.S.[] §§ 1501[-1991]. The [SCA] is clear the objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature. [*See* Section 1921(a) of the SCA,] 1 Pa.C.S.[] § 1921(a). [The Pennsylvania Supreme] Court has found that the best indication of the General Assembly's intent is the plain language of the statute. [*See*] *Martin v. . . . Dep't of Transp., Bureau of Driver Licensing*, . . . 905 A.2d 438 . . . ([Pa.] 2006). When the words of a statute are clear and unambiguous, there is no need to look beyond the plain meaning of the statute "under the pretext of pursuing its spirit." [Section 1921(b) of the SCA,] 1 Pa.C.S.[] § 1921(b); *see Commonwealth v. Conklin*, . . . 897 A.2d 1168, 1175 ([Pa.] 2006). Consequently, only when the words of a statute are ambiguous should a court seek to ascertain the intent of the General Assembly through consideration of the various factors found in Section 1921(c) [of the SCA]. [*See*] 1 Pa.C.S.[] § 1921(c); [*see also*] *Koken v. Reliance Ins. Co.*, . . . 893 A.2d 70 . . . ([Pa.] 2006).

*Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1201 (Pa. 2009). This Court has explained:

> [A]lthough we must "listen attentively to what a statute says[,] [o]ne must also listen attentively to what it does not say." *Kmonk-Sullivan v. State Farm Mut. Auto. Ins. Co.*, . . . 788 A.2d 955, 962 ([Pa.] 2001). [This Court] may not insert a word the legislature failed to supply into a statute.

*Honey v. Lycoming Cnty. Offs. of Voter Servs.*, 312 A.3d 942, 948 (Pa. Cmwlth. 2024), *appeal granted*, 327 A.3d 611 (Pa. 2024) (quoting *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 918 A.2d 171, 175-76 (Pa. Cmwlth. 2007)).

The *Mimi Investors* Court acknowledged that when the General Assembly intends to include an element in the Act's material provisions, it uses unambiguous language to that effect. *See id*. The Pennsylvania Supreme Court has also held that Pennsylvania courts "generally assume that[] 'where a section of a statute contains a given provision, the omission of such a provision from a similar section' signifies a different legislative intent." *Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 839 (Pa. 2017) (quoting *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (2009)). The *Mimi Investors* Court distinguished Sections 401(b) and 501(a)(ii) of the Act, the latter of which this Court observes uses negligence-like language (i.e., knowing, reasonable care) in setting forth a defense for offerors and sellers of securities for private causes of action. That same language does not appear in Section 401(b) of the Act related to a Bureau's enforcement action, and this Court will not read such language into it. Thus, regardless of whether the Department may have previously cited to or relied on *Aaron*, that case is inapposite here.[29]

---

[29] This Court adopts the Department's reasoning that the Goldberg Entities' reliance on *Aaron* is misplaced:

> *Aaron* involved the interpretation of [Section] 17(a) of the [federal] Securities Act of 1933 [(1933 Act)] and [Section] 10(b) of the [federal] Securities and Exchange Act of 1934 [(1934 Act)]. Th[o]se federal statutes are not relevant in this instance because the[ir] text . . . differs materially from the text of the [] Act. In particular, the federal statutes do not contain a parallel provision to [Section] 501(a) [of the Act], which . . . allows defendants in private actions under the [] Act to argue the absence of negligence as an affirmative defense. Moreover, federal courts - including the [U.S.] Supreme Court - "are bound by state supreme courts' interpretations of state law." *U[.]S[.] v. Harris*, 289 A.3d 1060, 1069 (Pa. 2023). "A federal court's interpretation of state law, however, does not bind this court." *Clay v. Advanced Comput. Applications, Inc.*, 536 A.2d 1375, 1380 n.5 (Pa. Super. 1988), *rev'd* in part on other grounds, 559 A.2d 917 (Pa. 1989). Finally, [Section] 11 of the 1933 Act

<u>Failure to Identify the MCA Funders</u>

Regarding the Goldberg Entities' arguments that the Department erred by concluding that they violated Section 401(b) of the Act by failing to identify the MCA funders engaged by the LLCs and/or operating histories and failing to disclose the consequences of Goldberg collecting his full management fee from each LLC, the Department declared: "[T]here is nothing in the text that would give discretion to [the Goldberg Entities] to determine what information to disclose to the [] LLC Note [P]urchasers.  The test is whether a reasonable [] LLC Note [P]urchaser would consider the information important before deciding to purchase the [N]otes."[30]  Final Order at 54.

In order to further its purpose of protecting the investing public, *see Lenau*, Section 401(b) of the Act prohibited the Goldberg Entities from *omitting material facts* in connection with their offer or sale of the LLC Notes.  *See* 70 P.S. § 1-401(b).  The General Assembly did not define *material fact* relative to Section 401(b) of the Act, and there is little precedential case law interpreting that provision.

---

provides a better analogy to [Section] 401(b) [of the Act] in this instance because this case involves statements and omissions made by issuers of securities.  Section 11 [of the 1933 Act] "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  Here, the Goldberg LLCs were issuers, and under [Section] 11 [of the 1933 Act], "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements."  *Id*. at 382.

Department Br. at 32 n.8.

[30] The Goldberg Entities cite to *Aaron* to support their declaration that the Department ignored their valid business reason for omitting the MCA funder identities and erroneously applied a *subjective* test (i.e., what information a potential investor would consider important to have before making an investment) to find a violation.  However, not only has this Court declared *Aaron* inapplicable to the instant matter, the test the Department applied was "an objective one."  *TSC Indus., Inc.*, 426 U.S. at 445.

*See Mimi Investors*. However, Section 4107(a)(8) of the Crimes Code (relating to deceptive or fraudulent business practices) defines *material statement* as

> a statement about any matter which could affect an investor's decision to invest in a business venture, including, but not limited to, statements about:
>
> (i) the existence, value, availability[,] or marketability of a product;
>
> (ii) the number of former or current investors, the amount of their investments[,] or the amount of their former or current compensation;
>
> (iii) the available pool or number of prospective investors, including those who have not yet been solicited and those who already have been solicited but have not yet made an investment;
>
> (iv) representations of future compensation to be received by investors or prospective investors; or
>
> (v) the source of former, current or future compensation paid or to be paid to investors or prospective investors.

18 Pa.C.S. § 4107(a)(8). In addition, in *Commonwealth v. Stockard*, 499 A.2d 598, 606 (Pa. Super. 1985), Pennsylvania Superior Court President Judge Spaeth observed in his concurrence:[31]

> The . . . Act does not define "material fact," and case law under the Act to date has not developed a definition, but it is clear that in the context of a transaction in securities, "material fact" has a specialized meaning. The [U.S. Court of Appeals for the] Second Circuit has defined "material fact" as follows:
>
> > As we said in *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2[]d Cir. 1965)[:] "The basic test of materiality . . . is whether a *reasonable* man would

---

[31] Although defining the term *material* as it is used in Section 401(b) of the Act was not ultimately necessary based on the Superior Court's disposition of that case, Judge Spaeth's concurrence is persuasive.

> attach importance . . . in determining his choice of action in the transaction in question. Restatement [(First) of] Torts § 538(2)(a) [(A.L.I. 1938)]; accord Prosser, Torts 554-55; I Harper & James, Torts, 565-66." (Emphasis supplied.) This, of course, encompasses any fact ". . . which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities. . . ." *List . . . , . . .* [340 F.2d] at 462 . . . . (Emphasis supplied.)
>
> *Sec*[.] [*&*] *Exch*[.] *Comm*[*'n*] *v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied sub. nom. Coates v. Sec*[.] [*&*] *Exch*[.] *Comm*[*'n*], 394 U.S. 976 . . . (1969)[; s]*ee also Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 . . . (1972) ("All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.")[.]

*Stockard*, 499 A.2d at 606 (Spaeth, J., concurring); *see also Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (adopting the U.S. Supreme Court's materiality standard set forth in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), in the context of the 1934 Act); *TSC Indus., Inc.*, 426 U.S. at 445 ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." "Variations in the formulation of a general test of materiality occur in the articulation of just how significant a fact must be or, put another way, how certain it must be that the fact would affect a reasonable investor's judgment.").

Here, Houtz testified that the PPMs for 442, 567, 803, and 1931, portions of which described the relationships between them, their subscribers, and the bank firms to whom they would provide MCAs did not provide the names or operating histories of the MCA funders. *See* R.R. at 207a-214a. Goldberg confirmed that the LLCs never disclosed to LLC Note investors any of the 36 specific MCA funding companies with whom they were dealing, either in

33

discussions with them or in the PPMs, because they considered that information a trade secret.[32] *See* R.R. at 261a-262a, 437a-438a, 450a-481a.

The Department properly found that the LLCs withheld the MCA funding company names from the LLC Note investors.[33] *See* FOF 135. The Department found, as stated above, that: Goldberg advertised on his LinkedIn page that the LLC Notes "offer[ed] attractive returns of 6% to 20% annually to investors by participating in cash advances to small businesses[,]" FOF 150; Goldberg previously encouraged investors to purchase Global Notes and Global thereafter filed for bankruptcy and defaulted on investor payments, *see* FOFs 16-18, 21-23; and, despite the LLC Note PPMs' suggestion that prospective investors independently determine whether the LLC Notes were suitable investments for them, *see* FOF's 88-91, they could not research the MCA funding firms without knowing their identities, *see* FOF 135. In that context, the Department concluded that "[t]he operating histories of the MCA [f]unding [f]irms are deemed to be facts a reasonable [] LLC Note [P]urchaser would want to know before purchasing the [LLC N]otes[,]" Final Order at 54-55, and, by withholding that information purely to protect their bottom line, the Goldberg Entities omitted material facts necessary to correct misleading statements in their offer and sales of the LLC Notes in violation

---

[32] Goldberg explained:

> I spent a lot of time cultivating and doing my due diligence on these funders. This is really my trade secret. If I put this in a PPM, anybody can go and take advantage of the work that I do. So while I do say in my PPM that I vet these funders, I did not feel that I needed to disclose them only because it would impact the business if my competitors got a hold of it.

R.R. at 438a.

[33] Goldberg speculated that revealing such information would allow competitors to affect the Goldberg Entities' businesses, and suggested that if a prospective Note investor felt uncomfortable purchasing an LLC Note without the MCA funder identities, he/she could have declined to make the purchase. *See* R.R. at 261a, 438a; *see also* Goldberg Entities' Br. at 37.

of Section 401(b) of the Act. Because the Department's conclusion was based on factual findings supported by substantial record evidence and the law, this Court will not disturb it.

### Failure to Disclose LLC Management Fee Consequences

Goldberg explained that the LLCs technically operated at losses because of the management fees owed, so he only took those fees when necessary. *See* R.R. at 267a-269a, 287a-289a, 497a. However, Goldberg claimed that none of the LLCs were insolvent at any point, nor did they default on any P&I payments to the Note holders, and he always stood ready to voluntarily inject capital if and when necessary. *See* R.R. at 481a-483a, 499a-500a. Goldberg admitted that he included financial statements with the PPMs so that investors could see the value of the entities to which they were loaning money and make educated investment decisions. *See* R.R. at 261a. Goldberg recalled that he initially named the financial statements *balance sheets*, but after being informed that they were not actually balance sheets, he renamed them *metrics*, but he did not correspondingly change their balance sheet-like format, or notify investors that the documents were not, in fact, balance sheets. *See* R.R. at 261a-263a, 484a, 489a, 500a-503a.

The Department found, based on Goldberg's admissions, that Goldberg was entitled to management fees as the sole member and manager of the LLCs, but that he did not always withdraw his full compensation because, if he had, the LLCs would have operated at a loss. *See* FOFs 136-137, 139-142, 167-168. Substantial record evidence supports the Department's finding that the Goldberg Entities did not specifically disclose that fact to potential LLC Note investors.[34] *See* Final Order at

---

[34] The Goldberg Entities insisted that potential LLC Note investors could discern based on the fact that Goldberg was the LLCs' sole owner and member that he was entitled to management fees, and they were not required to disclose that Goldberg might decline to collect some of his fees for whatever reason.

35

55-56. In addition, the Department found that Goldberg was under no legal obligation to inject additional capital into the LLCs to financially sustain them. *See* FOF 169. The Department concluded that, under those circumstances, a reasonable investor would want to know that their funds could be in jeopardy if Goldberg collected all the management fees to which he was entitled, *see* Final Order at 55-56, and, by withholding that information, the Goldberg Entities omitted a material fact necessary to correct misleading statements in their offer and sales of the LLC Notes in violation of Section 401(b) of the Act. Because the Department's conclusion was based on factual findings supported by substantial record evidence and the law, this Court will not disturb it.

### 4. Section 401(c) of the Act

The Goldberg Entities also argue that the Department erred by concluding that the Bureau's expert testimony supported the allegations brought under Section 401(c) of the Act. They specifically contend that Yother's unsubstantiated testimony and report did not support the Bureau's claims related to 1931's July 2019 financial statement, where the financial metric labeled as a balance sheet bore no connection to 1931's general ledger used for internal cash management purposes and it did not affect 1931's solvency evaluation.

Section 401(c) of the Act makes it unlawful for any person, in connection with the offer, sale, or purchase of any security in this state, directly or indirectly "[t]o engage in any act, practice[,] or course of business which operates or would operate as a fraud or deceit upon any person." 70 P.S. § 1-401(c). Based on the plain text of that provision and *Mimi Investors*, the Department determined that the Bureau did not have to prove scienter under Section 401(c) of the Act. The Department concluded that a reasonable investor would want to review accurate and properly identified financial information when deciding whether to purchase the

LLC Notes, the evidence supported a finding that Goldberg made false entries on at least one of 1931's financial statements, and the Bureau met its burden of proving that the Goldberg Entities, "in connection with the offer, sale[,] or purchase of [] securit[ies] in this [s]tate, directly or indirectly engaged in an act, practice[,] or course of business which operates or would operate as a fraud or deceit upon [] any person in violation of Section 401(c) of the Act." Final Order at 58.

The Bureau offered, without objection, Yother as an expert in accounting, solvency evaluations, and U.S. generally accepted accounting procedures (GAAP). *See* R.R. at 307a-308a. Yother testified that he conducted solvency evaluations for 442, 567, and 1931. *See* R.R. at 308a-309a. He specifically recalled that he reviewed 1931's December 31, 2018 general ledger which had been audited by an independent professional accounting service and, based thereon, determined that because there was a deficit of $284,657.00, 1931 was not solvent at that time. *See* R.R. at 322a. However, because he could not reconcile the numbers with the records Goldberg supplied to the Bureau, he did not have confidence in 1931's unaudited July 31, November 30, and December 31, 2019 and July 31, 2020 general ledgers, and could not render decisions as to whether 1931 was solvent or insolvent at those times. *See* R.R. at 323a-344a. Notably, 1931's PPM included a July 31, 2019 balance sheet Goldberg shared with investors showing 1931 assets totaling $5,256,082.00, while 1931's internal general ledger reflected that its assets were only $4,036,622.28 (a $1,219,459.72 difference) and, in July 2020, 1931 showed a negative asset number of $17,687,143.31. *See* R.R. at 328a-329a, 341a.

Regarding 442, Yother stated that he could not reconcile the numbers and, thus, did not have confidence in 442's unaudited October 31, 2018 and November 30, 2019 general ledgers, so he could not render a determination as to whether 442 was solvent or insolvent at those times. *See* R.R. at 344a-353a. However, making the assumptions that the intercompany management fee is an

expense item, and the MCA participation and payments as assets, he was able to determine that 442 was solvent as of December 31, 2018. *See* R.R. at 348a. Yother also concluded based on 442's July 31, 2020 general ledger that 442 was insolvent at that time. *See* R.R. at 353a-356a.

Yother recalled relative to his review of 567 that he again could not reconcile the numbers and he did not have confidence in 567's unaudited December 31, 2019 general ledger, so he could not render a determination as to whether 567 was solvent or insolvent at that time. *See* R.R. at 357a-359a. He opined based on 567's July 31, 2020 general ledger that 567 was insolvent at that time. *See* R.R. at 359a-361a.

Yother, overall, observed four departures from GAAP in the LLCs' financial statements: (1) (with the exception of 1931) the financial statements were not prepared using a full accrual method as required when they are being disseminated to third parties and the LLCs did not disclose that fact; (2) there were discrepancies in the accounting of potential gains of future MCAs for which he could not determine how or why they were recorded; (3) management fees were unsubstantiated and did not receive proper accounting treatment (i.e., when they probably were expenses, they were reported as assets on some financial statements without a corresponding liability); and (4) the inconsistent accounting treatment of the MCA participation accounts, where they were reported as expense line items yet were not listed on the balance sheets, which is inconsistent with how MCA participation and payments have been historically treated. *See* R.R. at 362a-372a. Yother represented that he rendered all his conclusions with a reasonable degree of professional certainty. *See* R.R. at 342a, 362a.

Yother recalled that the Goldberg Entities used a cash basis for accounting, which he explained was an acceptable accounting basis - most often used by small businesses and sole proprietors - to which the GAAP does not apply.

*See* R.R. at 317a, 377a-380a. Yother articulated that the accounting method a company uses is driven by its particular needs for management purposes only, not for dissemination to third-party users. *See* R.R. at 381a-382a. Yother added that his difficulty assessing the LLCs' solvency stemmed from the documentation Goldberg supplied - some of which included numbers whose sources were not evident - not the LLCs' cash accounting method. *See* R.R. at 386a-389a.

Yother testified and the Department observed, that the July 31, 2019 balance sheet Goldberg shared with 1931's investors reflected that 1931 had $1,219,459.72 more assets than 1931's internal general ledger. *See* R.R. at 328a-329a, 341a. Goldberg did not explain why the July 31, 2019 balance sheet numbers were inflated; rather, he merely asserted that he did not share the internal general ledger information with investors. *See* R.R. at 449a. Moreover, despite that he claimed to have provided financial statements with the 1931 PPMs so that investors could see the value of the entities to which they were loaning money and make educated investment decisions, *see* R.R. at 261a, Goldberg admitted that the financial information he included with 1931's PPMs were not actually balance sheets, and after he modified the titles thereof, he did not notify 1931 investors that the documents were not balance sheets. *See* R.R. at 261a-263a, 484a, 489a.

Giving the Bureau the benefit of all reasonable and logical inferences to be drawn from the evidence, as this Court must, *see Hauck*, because substantial record evidence supported the Department's findings regarding Yother's testimony about 1931's July 2019 financial statement, this Court will not disturb them. *See Alsyrawan*.

## 5. Damages

The Goldberg Entities contend that because the LLC Note holders have received all the P&I they were promised and, thus, they did not suffer any damages,

this Court must reverse the Department's conclusion that they violated Section 401(b) and (c) of the Act. However, as stated above, Section 401(b) of the Act makes it unlawful in connection with the offer, sale, or purchase of any security "[t]o make any untrue statement[s] of [] material fact or to omit" material facts. 70 P.S. § 1-401(b). Section 401(c) of the Act makes it unlawful in connection with the offer, sale, or purchase of any security "[t]o engage in any act, practice[,] or course of business which operates or would operate as a fraud or deceit upon any person." 70 P.S. § 1-401(c). The plain language of both subsections makes clear that the violation exists if there was an act or omission in the offer or sale of a security, not whether damages resulted therefrom. In addition, Section 602.1(c)(1) of the Act,[35] which sets forth the amount of acceptable assessments the Department may impose, does not reference injuries or damages. *See* 70 P.S. § 1-602.1(c)(1). Finally, Section 602.1(c)(2) of the Act, which authorizes the Department, when determining the amount of administrative assessments to impose, to consider such things as: the circumstances, nature, seriousness, and willfulness of the violative conduct; the scope of the violation, including number of persons affected; the amount of compensation the violator earned; past and concurrent violator conduct; and such other factors the Department deems appropriate to protect investors. *See* 70 P.S. § 1-602.1(c)(2). Accordingly, the fact that LLC Note holders may not have sustained any damages is not a basis on which this Court may reverse the Department's conclusion that the Goldberg Entities violated Section 401(b) and (c) of the Act.

**6. Constitutional Rights**

Finally, the Goldberg Entities argue that the Department abrogated their constitutional rights to due process, to a jury trial, and to be free of excessive fines.

---

[35] Added by Section 3 of the Act of May 4, 1993, P.L. 4.

<u>Due Process</u>

The Goldberg Entities aver that since the Bureau and the Department were judge, jury, and prosecutor, the record is rife with prejudgment bias and, therefore, the Department violated their due process rights.

"It is well[ ]settled that 'the constitutional guarantees of due process apply equally to proceedings before administrative tribunals,' and that '[t]he basic requirements of due process are notice and an opportunity to be heard.'" *Fisler*, 78 A.3d at 41 (quoting *Gow v. Dep't of Educ.*, 763 A.2d 528, 533 (Pa. Cmwlth. 2000)); *see also* Section 504 of the Administrative Agency Law, 2 Pa.C.S. § 504. Certainly,

> [a] fair trial conducted in a fair tribunal is a basic and fundamental requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. Courts have recognized that "the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation" of due process. *Kuszyk v. Zoning Hearing B[d.] of Amity T[wp.]*, 834 A.2d 661, 665 (Pa. Cmwlth. 2003) . . . . A question of due process reasonably involves an inquiry into the nature of the process actually provided. *Lyness v. State B[d.] of Med[.]*, . . . 605 A.2d 1204 ([Pa.] 1992); *Stone [&] Edwards Ins[.] Agency, Inc. v. Dep['t] of Ins[.]*, . . . 636 A.2d 293, 297 [(Pa. Cmwlth.)], *aff'd*, . . . 648 A.2d 304 ([Pa.] 1994).

*HYK Constr. Co., Inc. v. Smithfield Twp.*, 8 A.3d 1009, 1018 (Pa. Cmwlth. 2010). This Court acknowledges that Pennsylvania courts have held that the due process right to a fair and impartial tribunal under article I of the Pennsylvania Constitution is violated when members of a board that make a decision to bring an enforcement action also participate in the final adjudication thereof. *See Lyness*; *see also HYK Constr*. However, the *Stone & Edwards* Court clarified that a single administrative agency may exercise prosecutorial and adjudicative functions if there are walls of division that clearly separate those functions. *See id.*; *see also HYK Constr*.

41

In the instant matter, the Goldberg Entities do not specify whether or how the Bureau and the Department may have violated commingling safeguards, nor further developed such argument in their brief.[36] Moreover, the Goldberg Entities were

> afforded all the process to which [they were] due. The original [OTSC] clearly listed all the charges against [them], and [they were] given adequate time to respond. The hearing notice sent by the [Bureau] explicitly stated that witnesses could be called and that [the Goldberg Entities] could call [their] own witnesses in [their] defense. [*See* Certified Record, Item 19.] Moreover, counsel represented [the Goldberg Entities] during the hearing; any concerns [they] had regarding witnesses and evidence should have been discussed with [their] counsel at that time. There is nothing in the record to suggest that the hearing was not conducted in accordance with [the GRAPP], and [the Goldberg Entities] had every opportunity to be heard.

*Schwalm v. Pa. Sec. Comm'n*, 965 A.2d 326, 330 (Pa. Cmwlth. 2009). Accordingly, the Department did not violate the Goldberg Entities' procedural due process rights.

---

[36] In its Brief Opposing Exceptions, the Bureau declared:

> The Pennsylvania Supreme Court has long held "that if more than one function is reposed in a single administrative entity, walls of division must be construed to eliminate the threat or appearance of bias." *Off*[.] *of Disciplinary Couns*[.] *v. Duffield*, 644 A.2d 1186, 1188 (Pa. 1994). That standard was clearly satisfied here. While the Bureau made the decision to investigate and file formal charges against [the Goldberg Entities], the Hearing Officer that was appointed to oversee this proceeding was from a different state agency entirely and played no role whatsoever in the Bureau's investigation or charging decisions. The [Department] is also walled off and separate from the Bureau and played absolutely no role in those decisions. "This procedure does not involve commingling of prosecutorial and adjudicative functions. Due process is therefore not violated." *Id*.

R.R. at 860a-861a.

<u>Jury Trial</u>

The Goldberg Entities further contend that the Department deprived them of their right to a jury trial on the Bureau's claims that they violated Section 401 of the Act. They assert that the landmark case of *Securities & Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024), settled their rights to be adjudged by a neutral judge and jury under the Seventh Amendment to the U.S. Constitution (Seventh Amendment)[37] and, by extension, article I, section 6 of the Pennsylvania Constitution.[38]

Indeed, "[t]he right to a jury trial in a civil action is a fundamental aspect of our system of law." *Bruckshaw v. Frankford Hosp. of City of Phila.*, 58 A.3d 102, 109 (Pa. 2012). To that end, article I, section 6 of the Pennsylvania Constitution declares, in pertinent part: "Trial by jury shall be as heretofore, and the right thereof remain inviolate." PA. CONST. art. I, § 6. However, Pennsylvania law "is well[ ]settled that, unlike the Sixth Amendment to the [U.S.] Constitution's rights to a jury trial in criminal cases,[39] the Seventh Amendment jury trial guarantee in civil cases has not been applied to the states by incorporation into the Fourteenth Amendment [to the U.S. Constitution (Fourteenth Amendment)]."[40] *Tewell v. Unemployment Comp. Bd. of Rev.*, 279 A.3d 644, 655 (Pa. Cmwlth. 2022) (quoting *Bensinger v. Univ. of Pittsburgh Med. Ctr.*, 98 A.3d 672, 676 n.6 (Pa. Super. 2014)). Therefore, *Jarkesy* does not control in this instance.

---

[37] U.S. CONST. amend. VII ("In [s]uits at common law, where the value in controversy shall exceed [$20.00], the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the [U.S.], than according to the rules of the common law.").

[38] PA. CONST. art. I, § 6.

[39] U.S. CONST. amend. XVI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[] by an impartial jury of the [s]tate and district wherein the crime shall have been committed . . . .").

[40] U.S. CONST. amend. XIV, § 1 ("[N]or shall any [s]tate deprive any person of life, liberty, or property without due process of law.").

Rather, the Pennsylvania Supreme Court has ruled that article I, section 6 of the Pennsylvania Constitution as adopted in 1790 "preserves the right to trial by jury in cases where that right existed at common law." *Blum by Blum v. Merrell Dow Pharm., Inc.*, 626 A.2d 537, 543 (Pa. 1993); *see also Mishoe v. Erie Ins. Co.*, 824 A.2d 1153 (Pa. 2003); *Wertz v. Chapman Twp.*, 741 A.2d 1272 (Pa. 1999). This is because

> [t]he constitutional guarantee of a trial by jury does not . . . prevent the legislature from creating or providing modes or tribunals other than the jury trial for the determination or adjustment of rights and liabilities which were not in existence prior to the adoption of the state constitution. *Tax Rev*[.] *B*[d.] *of Phila*[.] *v. Weiner*, . . . 157 A.2d 879 ([Pa.] 1960); *Premier Cereal & Beverage Co. v. P*[a.] *Alcohol Permit B*[d.], . . . 140 A. 858 ([Pa.] 1928). The legislature may withhold trial by jury from new judicial proceedings created by statute and clothed with no common law jurisdiction. *W.J. Dillner Transfer Co. v. P*[a.] *Pub*[.] *Util*[.] *Comm*['n], . . . 155 A.2d 429 ([Pa. Super.] 1959).

*Grant v. GAF Corp.*, 608 A.2d 1047, 1058 (Pa. Super. 1992), *aff'd sub nom.*, *Gasperin v. GAF Corp.*, 639 A.2d 1170 (Pa. 1994).

Consequently, the Pennsylvania Supreme Court has prescribed that, in order to determine whether one is entitled to a jury trial under the Pennsylvania Constitution, Pennsylvania courts must determine: (1) whether the General Assembly included a right to a jury trial in the relevant statute; (2) in the absence of a statutory basis, whether a jury trial right existed for the particular cause of action when the Pennsylvania Constitution was adopted;[41] and, if it did, (3) whether there

---

[41] According to the *Mishoe* Court, article I, section 6 of the Pennsylvania Constitution

has remained essentially unchanged since the Constitution of 1790 was adopted. *See Wertz*, 741 A.2d at 1275-76. The Constitution of 1776 generally provided that, in civil suits, "the parties have a right to trial by jury, which ought to be held sacred," PA. CONST. (1776)

was a common law (rather than statutory) basis for the proceeding.[42, 43] *See Wertz*; *see also Tewell*; *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396 (Pa. Super. 2012).

---

ch. 1, cl. 11, and that "[t]rials shall be by jury as heretofore," *id.*, ch. 2, § 25. The Constitution of 1790 provided "[t]hat trial by jury shall be as heretofore, and the right thereof remain inviolate." PA. CONST. (1790) art. 9, § 6. The wording of this provision has not changed since 1790, although in 1874 it was moved to a different section within the Constitution. *See* PA. CONST. (1838) art. 9, § 6; PA. CONST. (1874) art. [I], § 6; PA. CONST. (1968) art. [I], § 6.

*Mishoe*, 824 A.2d at 1160 n.10.

[42] "The term 'common law basis' does not . . . mean that the action originated at common law . . . . Rather, 'common law basis' refers to the nature of the proceeding in common law courts such as the Court of Exchequer, but not courts of Admiralty or Chancery." *Commonwealth v. One (1) 1984 Z-28 Camaro Coupe*, 610 A.2d 36, 39 (Pa. 1992).

[43] The Pennsylvania Supreme Court explained in response to an argument that federal decisional law entitles those in the Goldberg Entities' position to a jury trial:

[F]ederal cases regarding the right to a jury trial are based upon the Seventh Amendment . . . . Although worded differently, the federal constitutional amendment is analogous to its Pennsylvania counterpart. Both provisions retain the right to jury trial in civil cases where it existed at common law. Despite the similarities, this [C]ourt has made clear that in interpreting a provision of the Pennsylvania Supreme Court which interpret similar federal constitutional provisions. More importantly, . . . this [C]ourt has viewed the proper analysis under the Pennsylvania Constitution to consist of, *inter alia,* an inquiry into whether the [sic] a jury trial existed for the cause of action at common law at the time of the adoption of our Constitution. Conversely, federal case law examines whether the statutory cause of action is analogous to a common law claim for which there was a right to trial by jury, with focus . . . on the relief provided. . . . [T]his inquiry is simply not our [C]ourt's focus. . . . [T]his [C]ourt has eschewed a focus on the remedy sought and has embraced a view which looks to the cause of action in determining the right of a jury trial pursuant to [a]rticle I, [s]ection 6 of our Constitution. Thus, we find the federal decisions predicting a finding of the right to a jury trial to be unpersuasive and decline [the a]ppellant's suggestion that we adopt an analysis similar to that utilized by our federal colleagues. *Accord Hoy* [*v. Angelone*], 720 A.2d [745,] 745 [(Pa. 1998)] (federal decisions not binding

Here, the Act does not include an express right to a jury trial.[44] This Court further observes that, although fraud was a cause of action at common law for which a jury trial right attached when the Pennsylvania Constitution was adopted in 1790, *see Fazio*, the first state attempt to specifically regulate securities transactions occurred when Kansas enacted the first state securities law (blue sky law) in the nation in 1911,[45] and the Pennsylvania legislature appears to have enacted its first blue sky law in 1923.[46] Further, although the bulk of the Act makes it clear, Section 102 of the Act also specifies that the terms *fraud*, *deceit*, and *defraud* as used in the Act "are not limited to common law fraud or deceit." 70 P.S. § 1-102(h). Therefore, RIA and securities registration, fiduciary responsibilities, and related securities mandates applied to the Goldberg Entities in this litigation did not exist in 1790. *See Mishoe* (although juries were empaneled in trials regarding generic insurance policies in 1790, there is no right to a jury trial for insurer bad faith claims brought under Section 8371 of the Judicial Code);[47] *Wertz* (there is no right to a jury trial in Pennsylvania Human Relations Act[48] discrimination cases because sexual harassment and discrimination were foreign and unknown in common law when the

---

upon this [C]ourt as final arbiter of state law; reliance upon federal decisions predicting a finding of punitive damages misplaced).

*Wertz*, 741 A.2d at 1278 (citations omitted). Accordingly, *Jarkesy* does not control the instant case.

[44] Where the Act is silent regarding the right to a jury trial, this Court may presume the legislature did not intend such right to apply to Act violations. *See Wertz*. Moreover, merely "because the [Act] allows for legal relief [in the form of monetary damages] does not necessarily translate into a legislative intent to provide for a jury trial." *Wertz*, 741 A.2d at 1276.

[45] *See Sec. & Exch. Comm'n v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) ("Since 1911, all states except Nevada have enacted some type of '[b]lue [s]ky [l]aw.'"); *see also Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 371 (Kan. 2002) ("Kansas passed the first blue sky laws in the nation in 1911.").

[46] *See N. R. Bagley Co. v. Cameron*, 127 A. 311 (Pa. 1925) (refers to the Securities Act, Act of June 14, 1923, P.L. 779).

[47] 42 Pa.C.S. § 8371.

[48] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

46

Pennsylvania Constitution was adopted); *Bensinger* (there is no right to a jury trial under the Whistleblower Law[49] because there was no common law analogue to a whistleblower claim that encompassed a right to a jury trial in 1790); *Fazio* (although common law fraud existed as a cause of action when the Pennsylvania Constitution was adopted, there is no right to a jury trial for private causes of action under the Unfair Trade Practices and Consumer Protection Law[50] where such claims are not grounded solely in common law fraud).

Accordingly, neither the Act nor the Pennsylvania Constitution afforded the Goldberg Entities the constitutional right to a jury trial for civil violations of Section 401 of the Act.

## Excessive Fines

The Goldberg Entities also urge this Court to find the Department's administrative assessment scheme unconstitutional under article I, section 13 of the Pennsylvania Constitution.[51] They specifically assert that since assessments are the Bureau's primary source of income, its goal is to impose high assessments. The Goldberg Entities add that the $931,000.00 assessment in this case ($7,000.00 multiplied by 133 claims) was arbitrary and capricious[52] and excessive in light of mitigating circumstances as to the Global Notes and because the LLC Note holders neither complained nor were harmed.

---

[49] Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §§ 1421-1428.

[50] Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1 - 201-10.

[51] PA. CONST. art. I, § 13 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.").

[52] The Goldberg Entities raise as an example the Department's willingness to drop the Section 401 of the Act antifraud claims related to the LLC Notes and the entirety of the Global Note claims and focus solely on the RIA/LLC custody claims if the Goldberg Entities agreed to pay a $1,000,000.00 assessment. The Goldberg Entities objected to the custody claims and agreed to offer full recission to Note holders, but not to pay the $1,000,000.00 assessment. The Department declined the counteroffer and the matter proceeded to the hearing.

Article I, section 13 of the Pennsylvania Constitution prohibits the imposition of excessive fines.[53]  *See* PA. CONST. art. I, § 13.  That proscription "applies to a 'civil penalty' if the penalty is designed, at least in part, to serve 'either retributive or deterrent purposes.'"  *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 163 A.3d 1079, 1088 (Pa. Cmwlth. 2017), *aff'd*, 209 A.3d 246 (Pa. 2019) (quoting *Austin v. United States*, 509 U.S. 602 (1993)).  However, "[t]o be unconstitutional, the fine must be grossly disproportionate to the gravity of the offense."  *Blue Pilot Energy, LLC v. Pa. Pub. Util. Comm'n*, 241 A.3d 1254, 1271 (Pa. Cmwlth. 2020).

> [T]his Court explained:

>> [A]dministrative bodies having expertise in specific professional areas are to be entrusted to fashion administrative remedies that are fair and appropriate. [ ] Remedies and accompanying sanctions will not be disturbed on appeal absent a showing of a manifest and flagrant abuse of discretion or purely arbitrary execution of the agency's duties or functions. [ ] If a sentence imposed is within the statutory limits, there is no abuse of discretion unless the sentence is manifestly excessive so as to inflict too severe a punishment. [ ] Finding no proof of fraud, collusion, bad faith or abuse of power, a reviewing court will not substitute judicial discretion for administrative discretion.

> *Eckhart v. Dep't of Agric.*, 8 A.3d 401, 407 (Pa. Cmwlth. 2010) (internal citations omitted).

---

[53] "The Pennsylvania Supreme Court has held article I, section 13 [of the Pennsylvania Constitution] to be coextensive with the Eighth Amendment [to the U.S. Constitution,]" *Penn Film Grp. LLC v. State Ethics Comm'n*, 297 A.3d 455 (Pa. Cmwlth. 2023), which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  "The Eighth Amendment is made applicable to the states through the Fourteenth Amendment." *Commonwealth v. Real Prop. & Improvements Commonly Known as 5444 Spruce St.*, 832 A.2d 396, 399 (Pa. 2003).

*Burkholder v. Dep't of Agric.*, 265 A.3d 863, 866 (Pa. Cmwlth. 2021); *see also Gombach v. Dep't of State, Bureau of Comm'ns, Elections & Legis.*, 692 A.2d 1127 (Pa. Cmwlth. 1997) (Pennsylvania courts review civil fines to determine whether the assessing agency abused its discretion). Where an agency calculates its penalties based on the applicable law, they are not excessive, unreasonable, or disproportionate to the severity of the offenses. *See Eckhart.*

Pertinent here, Section 602.1(c)(1) of the Act[54] provides, in relevant part:

> The [D]epartment . . . may impose the administrative assessments set forth below. . . .
>
> (i) In issuing an order against any broker-dealer, agent, investment adviser[,] or [IAR] registered under [S]ection 301 [of the Act] . . . , **the [D]epartment may impose** a maximum administrative assessment of **up to** one hundred thousand dollars (**$100,000[.00]**) **for each act or omission that constitutes a violation of the [A]ct** . . . or that constitutes a dishonest or unethical practice in the securities business, taking unfair advantage of a customer, or failure to reasonably supervise its agents or employes. **If any of the victims** of the person's violative conduct **were** individuals **aged 60 or more**, **the [D]epartment also may impose** a special administrative assessment **in addition** to the foregoing amounts of **up to** fifty thousand dollars (**$50,000[.00]**).
>
> (ii) In issuing an order against a person **for wil[l]ful violation of** [S]ection 401 . . . **(c) [or] 404 [of the Act]** . . . , the [D]epartment may impose a maximum administrative assessment of **up to** one hundred thousand dollars (**$100,000[.00]**) **for each act or omission** that constitutes a violation of any of those sections. In addition to the foregoing assessment, **the [D]epartment also may impose** a special administrative assessment of **up to** fifty thousand dollars (**$50,000[.00]**) **for each** of the provisions

---

[54] Added by Section 3 of the Act of May 4, 1993, P.L. 4.

described as follows that the [D]epartment determines are applicable:

. . . .

(B) The **person's violative conduct involved individuals aged 60 or more**.

. . . .

(iii) In issuing an order against a person **for wil[l]ful violation of [S]ection 401(b) . . . [of the Act]**, the [D]epartment may impose an administrative assessment of up to fifty thousand dollars (**$50,000[.00]**) for each of the criteria described in subclause (ii)(A) and (C) that the [D]epartment determines are applicable. **No assessment shall be imposed under this subclause if the person is subject to an administrative assessment imposed under any other provision of this subsection**.

70 P.S. § 1-602.1(c)(1) (emphasis added). Section 602.1(c)(2) of the Act, 70 P.S. § 1-602.1(c)(2), authorizes the Department, when determining the amount of administrative assessments to impose, to consider such things as: the circumstances, nature, seriousness, and willfulness of the violative conduct; the scope of the violation (i.e., number of persons affected); the amount of compensation the violator has earned; and such other factors the Department deems appropriate to protect investors.

Here, the Department recognized that it could have imposed $14,700,000.00 in administrative assessments against the Goldberg Entities pursuant to Section 602.1(c) of the Act. *See* Final Order at 68 (R.R. at 689a). However, the Department considered mitigating factors and assessed only $931,000.00 against them. The Department reasoned, and substantial evidence supports, that despite Goldberg's 17 years of knowledge of the Act and the Department's Regulations, he placed Goldberg Entities' clients at risk of financial harm. *See id*. at 69-70 (R.R. at 690a-691a).

50

Moreover,

> [a]s the proponent[s] of the constitutional challenge, it was incumbent on [the Goldberg Entities] to develop, advance, and support the challenge. *See* Pa.R.A.P. 2119 (relating to argument section of appellate brief); *In re Condemnation ex rel. Dep't of Transp.*, 76 A.3d 101, 106 n.8 (Pa. Cmwlth. 2013) ("A party's failure to develop an issue in the argument section of its brief constitutes waiver of the issue."). [The Goldberg Entities], however, fail[ed] to offer any analysis to support its contention that the civil penalty levied against it in this matter is either (a) grossly disproportionate to the gravity of the offenses it committed or (b) grossly disproportionate to the civil fines assessed on similarly situated [persons]. Accordingly, [this Court] cannot conclude that the civil penalty imposed in this case is unconstitutionally excessive under [] the Pennsylvania Constitution . . . .

*Blue Pilot Energy*, 241 A.3d at 1271.

Where substantial record evidence supported that the Goldberg Entities committed the charged violations, and the Department's administrative assessments were within ranges the Act authorized for those violations, this Court concludes that the assessments were not excessive or an abuse of discretion and, thus, the Department did not violate article I, section 13 of the Pennsylvania Constitution.

## Conclusion

Based on the foregoing, this Court affirms the Department's Final Order.

_____
ANNE E. COVEY, Judge

51

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Goldata Computer Services, Inc. :
d/b/a Goldata Financial, Elliot :
Mitchell Goldberg, 1931 Funding, LLC, :
442 Funding, LLC, 567 Funding, LLC, :
803 Funding, LLC, and Legs 1, LLC, :
          Petitioners :
                      :
          v. :
                      :
Department of Banking and :
Securities, : No. 328 C.D. 2024
          Respondent :

## O R D E R

AND NOW, this 9th day of December, 2025, the Department of Banking and Securities' February 28, 2024 final order is AFFIRMED.

_____

ANNE E. COVEY, Judge